**Reversed and Rendered and Majority and Dissenting Opinions filed May 18, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00372-CR

---

## WILLIAM  SOLOMON LEWIS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1652421**

---

### MAJORITY OPINION

The State proved that appellant committed the offense of retaliation because he threatened to murder his mother on account of her service or status as a prospective witness against him in an upcoming trial.  But, the State alleged in the indictment that appellant committed the offense because of his mother's status only as a "witness," rather than a "prospective witness"—a distinct statutory term.  This fatal variance between the State's allegation and the proof at trial requires us to

reverse his conviction and render a judgment of acquittal due to insufficient evidence. *See Cada v. State*, 334 S.W.3d 766 (Tex. Crim. App. 2011).

## I.   BACKGROUND

In its indictment, the State alleged that in Harris County and on November 4, 2019, appellant "did then and there unlawfully, intentionally and knowingly harm and threaten to harm [the complainant] by an unlawful act, namely Murder, in retaliation for and on account of the service and status of [the complainant] as a witness."

In the trial of this case, the State adduced evidence that appellant had previously been indicted in April 2019 in the Harris County Criminal Court at Law No. 14 for harassing his mother, also the complainant in this case. The mother testified that the harassment charge was based on several text messages that he had sent her in April 2019.

A lieutenant with the Harris County Sheriff's Office testified that appellant had been out of jail on bond for the harassment charge, but on October 31, 2019, appellant was taken into custody and placed in the Harris County Jail. On November 4, appellant made a phone call from the jail to his ex-wife. The call was recorded, and the recording was admitted as an exhibit. After some discussion of other matters, the recording continues and concludes as follows:

Appellant: Where's my mom at?
Ex-wife: I am guessing she's at home.
Appellant: You never talk to her?
Ex-wife: Yeah, I talked to her. I don't know, Will, I don't think she's going to budge.
Appellant: What?
Ex-wife: I don't think she's going to budge on that.

Appellant:   Budge? Budge on what?

Ex-wife:   Didn't you ask—aren't you wanting me to talk to her about dropping the charges, or whatever?

Appellant:   No, I—

Ex-wife:   She's not dropping the charges.

Appellant:   Okay. So, she's trying to send me back to federal prison?

Ex-wife:   I don't think she's going to drop the charges.

Appellant:   So, she wants me back in federal prison is what you are saying, right?

Ex-wife:   She didn't say that. She said she hates to see you go but that she is not dropping the charges.

Appellant.   So, she hates to see me go back to—so, she wants me go to federal prison. She doesn't hate to see me go. I mean she wants to see me go.

Ex-wife:   I don't know, Will. I am staying out of you and your mom's stuff.

Appellant:   Does she know that I am in jail right now?

Ex-wife:   Oh, yeah, she knows. I told her.

Appellant:   Alright, so does she understand that they are sending me back to federal prison for three years?

Ex-wife:   She—I told her—I told her that. You said 30 months, and that's what I told her.

Appellant:   How many?

Ex-wife:   Didn't you say 30 months?

Appellant:   Yeah.

Ex-wife:   Mmm, yeah.

Appellant:   And she said, "Well, I am sorry that's just the way it is." Right?

Ex-wife:   No, she didn't say that. She just said she, you know, she was sorry to hear that.

Appellant:   So, she's going to show up and testify against me at my trial?

Ex-wife:     Mmm, I think so.

Appellant:   Alright. Well then I know what I gotta do when I get out. I'm gonna kill that bitch. She's dead. Period. And I don't give a fuck what these prosecutors think about that. I've said that, and that's recorded. They caused this situation.

Ex-wife:     Hmm. If I was you, I wouldn't be making those kinds of threats over the phone.

Appellant:   I don't give a fuck now. I am ready to die over this shit. You got me fucked up. You got me fucked up. I ain't no bitch, you know what I mean. She, she has—she steals. She fucks me out of 300 grand, and then has me sent to— then fucking tells me that, like, she is going to overrule me on my kid, and I ain't going to tell her shit about it. And then, has me locked up behind it, and then goes and treats me like a bitch and does whatever she wants with my kid. And then I'm a bitch, and then she's going to go to testify against me and have me go to prison. A man can only take so much, dude, and I've just had it. I don't give a fuck—

Ex-wife:     You don't know if she is going to—

Appellant:   Look, I ain't fighting none of this shit no more. When I get out, I am going to handle my business. Dude, I have been trying to be good. I have been trying to fight this shit and maintain my innocence on all these other charges that they have tried to frame me on, but I am done now. I am the bad guy now. I'm snapping off when I get out. Let me out of here. I'm going to go post this bond, dude, and I am walking. And, I am going to go handle my shit. That's what I'm going to do. I gotta go kill some people, dude. That's what I gotta go do. That's where we are at now.

Ex-wife:     Hmmm.

Appellant:   I am through trying to play. They just pushed me over the edge right now. I just snapped the fuck off. My car has been stolen and wrecked. My other car has been fucking put in the impound, and now they're trying to

4

send me back to federal prison, dude. And all my shit has been thrown away. All my legal materials are gone. Everything I have been working on, it's all gone. Everything that I have been working on for the last 15 years is in the trash. So, you know, I'm—I'm—I'm ready. I got nothing to live for, dude. I am ready to die, and I am going to take some motherfuckers with me, too. Just pushed me over the—I just snapped off right now.

Ex-wife: Hmm, now where are—which prison are you—jail are you in?

Appellant: I mean it really don't matter. I posted a bond. I'm going to get the fuck out, and I got to go handle the business. I will be dead in a few days.

Ex-wife: Hmmm.

Appellant: That's it. There's no "hmmm" about it. That's the way it's going to be.

Ex-wife: Hmm, well, it's your life. It's your life.

Appellant: Yeah, well, I mean, you know, my soul is prepared to die. I'm done. This is the way I want it. I'm not going to be a bitch, dude, anymore. I've been being a bitch for the last fifteen years. I'm tired of being a bitch. I let them run all over me and accuse me of shit I didn't do. I said I was going to sue a cop. They sent me to prison and held me in double-door lockdown for fucking five years. Then, when I get out, they fucking do a search warrant—an illegal search warrant on me trying to look for more evidence trying to get me on something when I'm trying to, like, do legal work against people, right, through the courts. And they consider that a threat—another threat. And they take my stuff and my paperwork, and they turn around and use it against me and get a search warrant. And then they find a gun that Cody put in the car that I didn't know anything about. And I gotta spend—

Ex-wife: Hey, you have that affidavit still, right?

Appellant: That affidavit has been submitted. That's why they did it. But I don't give a fuck about any of that anymore. I told you, I don't care now. It's over. I don't care. Fuck

all that.  Fuck that affidavit.  Fuck all that shit I'm fighting.  Fuck that lawsuit.  Fuck everything, dude.  I'm ready to go now.  My soul is prepared to die.  I'm going to get myself an AR-15 carbine with fucking hundred-round clips, full metal jacket, when I get out of here.  That's the way it's gonna go down.

Ex-wife:      Hmm.  Well—

Appellant:    My soul is prepared to die now over this.

Ex-wife:      So, listen, so what jail are you in right now?

Appellant:    It don't matter what jail I'm in.  It really don't.  I gotta just—I'm gonna go in, and I'm going to get this bond.  And I'm going to get the fuck out of here.  And then I gotta go take care of what I gotta take care of.  And then I'll be—you'll probably never hear or see from me ever again.  I'm ready to die now.

Ex-wife:      Hmm, well, you better watch what you say, Will.

Appellant:    I can't talk about it anymore.  I'm not—It don't matter what I say.  I don't give a fuck about what I say.  You don't—you don't—you not hearing what I'm saying?  I don't give a fuck.  I just got pushed over the edge right now.  I don't give a fuck.

Ex-wife:      You've been over the edge for a while.

Appellant:    No, I haven't been over the edge.  I've been working on legal work, trying to remedy, trying to prove my innocence and get real trials this time—this time from the street where you present witnesses and evidence on behalf of the defense instead of sitting down and resting after I've given an attorney eighty grand.  And he just rests the defense.  And then they find, and they come back fucking five minutes later and find me guilty and send me to prison for fucking years.  I mean, I'm not working like that anymore.  That's the way they've been doing me.  I ain't doing that anymore.

Ex-wife:      Hmm.  Well, Will, I gotta pay for this.

Appellant:    There's nothing.  There's nothing—

6

Ex-wife:     I understand.  I gotta pay for this phone call, so, I have to go.  I can't talk to you for a long time.

Appellant:   Who you—who you talking to?

Ex-wife:     I'm talking to you.

Appellant:   You gotta pay for this phone call?  It's eighteen cents a minute.

Ex-wife:     Yeah, but how many minutes have I been talking to you?

Appellant:   Look, this is what they wanted, right?  They wanted to hem me up in this fucking jail on a class C misdemeanor, right?  They wanted to hem me up in this jail when I'm about to win all these other cases, right?  Send a SWAT team after me for a class C misdemeanor.  Have me— maybe I'll resist.  Maybe I'll get killed.  Maybe I won't.  But then they'll put me back in here and have me on a bond that I can't pay, where I ain't got no way to get out, right?  And then, like, keep pushing my fucking buttons.  So I snap off.  And that's what they got.  I'm going to snap off now.  So what I'm gonna do is—

Ex-wife:     You need to stop making threats on the phone.

Appellant:   Here's what I'm going to—I don't give a fuck anymore.  I don't make threats on the phone.  I'm making threats on the phone now.  I'm making statements now.  This is the—for the first time in my life, I'm making some threats.  AR-15.  I'm—when I get out, look, here's what I'm going to do.  I'm going to go— I'm going to go to court.  I'm going to plead guilty, right?  And I'm going to get them to let me out of jail that day.  And then, we're going to have some motherfucking problems is what we're going to have.  'Cause they gotta get me out of here.  They gotta get me time served.

Ex-wife:     Hmm.  Well, when are you supposed to be doing the bond? The bond.  When?

Appellant:   There's not going to be a bond.  There's not going to be a bond.  I'm gonna go in there, and I'm just gonna plead guilty to this.  And I'm going to get out.  And I'm going to do what I gotta do.  I'm snapping off right now.  I'm

7

not coming back, either.  Anyways, dude, I'll catch you on the upside.  I'm just calling to let you know the way things are going to be.

Automated Voice: The caller has hung up.

The lieutenant testified that, during the call, appellant was referring to the harassment charges filed in the Harris County Criminal Court at Law No. 14: "Of course, that's the only case where—that I'm aware of at the time that she's the complaining witness."

The ex-wife testified that appellant was making threats against his mother "[b]ecause she was wanting to, I guess, testify against him."  The ex-wife testified that she believed appellant was talking about his mother testifying in the harassment case because "that's the only situation that they had going on where the courts were involved."

The mother testified that she never gave testimony in an official proceeding in the harassment case.  When she heard appellant's threat, it made her think twice about possibly testifying in the harassment case.

When the state rested its case, appellant moved for a directed verdict because the State failed to prove that appellant's threat was made on account of his mother's service or status as a witness, rather than as a prospective witness.  The State asked to reopen its case under *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003) ("[A] judge should reopen the case if the evidence would materially change the case in the proponent's favor.").  The State agreed with the court that if the case were not reopened, a directed verdict would be required.  The court granted the State's motion.

The State adduced additional testimony from appellant's mother that in April 2019 she had testified by affidavit in support of an application for a

protective order against appellant. In the affidavit, the mother detailed the facts underlying the harassment charge. In May 2019, she testified in person in the 280th Judicial District Court regarding the application. The 280th Court granted the protective order on the same day. The trial court admitted into evidence a copy of appellant's motion to quash the protective order, in which he argued that the allegations made in his mother's affidavit were not acts of family violence.

The mother reiterated that she had not testified in the harassment case and that the only trial that was coming up at the time of appellant's November 2019 recorded statement was the harassment charge. In the mother's opinion, appellant's recorded statement was referring to the "harassment case more than likely."

The jury found appellant guilty of retaliation. The court assessed punishment and sentenced appellant to eight years' confinement.

## II.    SUFFICIENCY OF THE EVIDENCE

In a single issue, appellant contends that the evidence is legally insufficient to prove that his threats were made on account of the mother's service or status as a witness. The State contends that circumstantial evidence would have allowed the jury to believe that appellant harbored a retaliatory intent about the mother's service as a witness in the protective order case.

### A.    Standard of Review

In reviewing whether there is sufficient evidence to support a conviction, we look at all the evidence presented in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *McKay v. State*, 474 S.W.3d 266, 269 (Tex. Crim. App. 2015). If the evidence is so weak that it creates only a suspicion

that a fact exists, then it is no more than a scintilla, and the evidence is insufficient. *See id.* at 270. The evidence is insufficient if there is merely a modicum of evidence probative of an element of the offense. *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

A defendant's intent may be inferred from circumstantial evidence such as the defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see also Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) ("We cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words and conduct."). If the evidence supports conflicting inferences, we assume the jury resolved the conflict in favor of the State. *McKay*, 474 S.W.3d at 270. Yet, juries may not come to conclusions based on mere speculation or factually unsupported inferences. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* at 16. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* In determining whether inferences are reasonable, we view the combined and cumulative force of all the evidence in the light most favorable to the verdict. *Garcia*, 367 S.W.3d at 687; *Hooper*, 214 S.W.3d at 16–17.

## B.     Hypothetically Correct Jury Charge for Retaliation

We measure the sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase

the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Id.* To be "authorized by the indictment," when the offense contains various statutory alternatives, the hypothetically correct charge may include only those alternative elements that are alleged in the indictment. *Id.* The sufficiency of the evidence is measured by the specific elements that the State has alleged in the indictment. *Id.* at 773–74. "Thus, if the State pleads one specific element from a penal offense that contains alternatives for that element, the sufficiency of the evidence is measured by the element that was actually pleaded, not any other statutory alternative element." *Id.* at 774.

The statutory elements of the felony offense of retaliation are: (1) the defendant (2) intentionally or knowingly (3) harms or threatens to harm (4) another person (5) by an unlawful act (6) in retaliation for or on account of (7) the service or status of another as (8) a public servant, witness, prospective witness, informant, or a person who has reported or who the actor knows intends to report the occurrence of a crime. *See* Tex. Penal Code § 36.06(a)(1); *Cada*, 334 S.W.3d at 770. The service or status of the complainant as a "witness" or "prospective witness" are different statutory elements of the underlying offense. *See Cada*, 334 S.W.3d at 770.

The State may plead in the conjunctive and charge in the disjunctive. *Id.* at 771. Thus, an indictment might allege that the defendant retaliated against the complainant because he was a "public servant, witness, prospective witness, and informant," and if the proof shows any one of those statutory alternative elements beyond a reasonable doubt, then the evidence is sufficient to support a conviction. *Id.* at 771. But, when the State pleads only a statutory element for which there is insufficient evidence, the conviction cannot be affirmed based on an unpleaded

11

statutory element for which there is sufficient evidence. *See id.* at 775–76 (insufficient evidence under the pleaded theory of "witness" although there was sufficient evidence for the unpleaded theory of "informant").

The term "witness" as used in the retaliation statute means that the complainant "has testified in an official proceeding." *Id.* at 770 (quoting *Jones v. State*, 628 S.W.2d 51, 55 (Tex. Crim. App. 1980)). When the State alleges the offense of retaliation based on the complainant's service as a witness, the State must prove that (1) the complainant has testified in an official proceeding; and (2) the defendant threatened the complainant "on account of, or because of, that service as a witness in an official proceeding." *Id.* at 774.

## C. Analysis

The State contends that appellant's statements in the recorded telephone call show that he was angry about many things as he aired a long list of grievances. The State contends, "A jury could well conclude that someone who harbored bitterness towards his mother—and based upon the conversation, everyone else—was also angry at her for the past testimony and obtaining of a protective order, not just selectively for future testimony alone."

Although it is not "completely unreasonable" to assume that appellant was angry at his mother for her past testimony in the protective order case, the additional inference that he threatened to murder his mother on account of, or because of, her past testimony in an official proceeding is not "sufficiently based on facts or evidence to support a finding beyond a reasonable doubt" when we consider the "combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *See Garcia*, 367 S.W.3d at 687, 689; *Hooper*, 214 S.W.3d at 16–17.

12

Appellant's threat against his mother occurred many months after the protective order proceedings, but only a few days after his bond was revoked in the harassment case and he was returned to jail. During the telephone call, he made the threat immediately after he learned that his mother intended to testify against him in the upcoming harassment trial. He continually referred to her future testimony in the harassment case sending him "back to federal prison." Although appellant referred to many other things that angered him, including his mother's conduct unrelated to her future testimony, appellant never mentioned her past testimony or the protective order. Every witness who testified understood appellant's statements in the recording to be referring only to the harassment case—an official proceeding in which the mother did not testify.

The State, citing federal cases applying federal witness tampering and retaliation statutes, notes that a defendant may have "mixed motivations" for making a threat. *See United States v. Maggitt*, 784 F.2d 590, 593–94 (5th Cir. 1986) (upholding convictions under both statutes when the defendant told the complainant that she knew what the complainant had "said" to a grand jury and that she "stood too much to lose"). We agree that the State did not need to prove that appellant's sole motivating purpose for threatening his mother was her prior testimony in an official proceeding. *Cf. In re M.W.*, 513 S.W.3d 9, 13–14 (Tex. App.—Tyler 2015, pet. denied) (sufficient evidence to support finding that the defendant struck a teacher because of the teacher's service as a public servant when the evidence showed that the defendant was attempting to harm another student in the course of striking the teacher, who was attempting to prevent the defendant from harming the student).

But, it is not enough for the State to prove only that appellant made a threat against someone who had testified at some official proceeding. The State must

prove beyond a reasonable doubt that appellant threatened her at least "on account of," i.e., because of, her testimony in an official proceeding. *See Cada*, 334 S.W.3d at 774. Regardless of whether the element of "on account of" requires a retributive intent,[1] or merely that the threat be "in any way related" to the complainant's service or status as a witness,[2] there is evidence of neither in this case. The record contains overwhelming evidence that appellant threatened his mother because of her status or service as a *prospective* witness and no evidence that he threatened her also because of her prior testimony in the protective order case. And the record contains no evidence that appellant's mother testified in some capacity in the harassment case—for example, in front of a grand jury or at a preliminary hearing—to suggest that appellant's threat was causally related to her service or status as a witness.[3]

Considering the entire record in the light most favorable to the verdict, a rational jury could not have found beyond a reasonable doubt that appellant threatened his mother in retaliation for or on account of her service or status as a witness. *See Cada*, 334 S.W.3d at 774.

---

[1] *See generally Creeks v. State*, No. 14-10-01026-CR, 2012 WL 1357676, at *2–4 (Tex. App.—Houston [14th Dist.] Apr. 17, 2012, pet. ref'd) (mem. op., not designated for publication) (noting split of authority in retaliation cases involving public servants: whether the State must prove that the threat or harm resulted from a "retributive attack for duties already performed").

[2] *Cf. Schmidt v. State*, 278 S.W.3d 353, 363 (Tex. Crim. App. 2009) (holding that the defendant was entitled to a lesser-included assault instruction for the offense of retaliation, as pleaded, when there was conflicting evidence about "whether his reason for assaulting her was in any way related to her statement to the police").

[3] We do not hold that a defendant's stated reason for threatening a person is dispositive of whether the threat was made on account of the person's specified status. For example, had appellant's threat been made in closer temporal proximity to the mother's testimony in the protective order case, a jury might well infer that appellant's threat was made because of her service as a witness—because appellant obtained a preview of her likely testimony in the harassment case. But in this case, the record contains nothing that would allow such an inference; it would be mere speculation.

14

**D.     Response to the Dissent**

The dissent suggests that the addition of the term "status" to the retaliation statute in 1997 broadened the statute such that a person may have the status of a witness even if the person has not testified, as required by the definition of "witness" provided in *Jones*. Thus, the dissent concludes that appellant's mother was a witness in the harassment case even though she did not testify in that case.

As reiterated in *Cada* after the 1997 amendment, "[T]he statutory term 'witness' in the retaliation statute means 'one who *has* testified in an official proceeding.'" *Cada*, 334 S.W.3d at 770 (quoting *Jones*, 628 S.W.2d at 55). The term "prospective witness" means a "person who may testify in an official proceeding." *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002) (quoting *Morrow v. State*, 862 S.W.2d 612, 614 (Tex. Crim. App. 1993)). Although the Court of Criminal Appeals has suggested in dicta that there is a "clear difference" between "status" and "service" as a witness, the court provided no explanation and subsequently reasoned there was "little difference" between "status" and "service" as a prospective witness. *See Ortiz*, 93 S.W.3d at 92.

The court has acknowledged that it is "not always easy to categorize a particular citizen who has been subject to retaliation into one specific box . . . to the exclusion of all other categories . . . [b]ut as this Court has previously noted, '[w]hile there may be some overlap among the categories of persons listed, each category is nevertheless distinct.'" *Cada*, 334 S.W.3d at 772 (quoting *Morrow*, 862 S.W.2d at 614). "[E]ven though there may be some overlap and considerable commonality between the various statutory categories of protected persons under the retaliation statute, they are distinct and separate statutory elements of the offense." *Id.* at 776.

15

The dissent's conclusion that there is little difference between a person having the "status as a witness" and the "status as a prospective witness" appears contrary to the principle that the different statutory categories of protected persons are distinct and separate statutory elements, *see Cada*, S.W.3d at 772, 776, even if there is sometimes "little difference" between the statutory terms "status" and "service," *see Ortiz*, 93 S.W.3d at 92.

Although the Legislature has broadened the retaliation statute over time to protect every category of person who might possess information regarding criminal activity, the burden remains on the State to plead and prove in each case the statutory elements alleged in the indictment. *See id.* at 775–76. In this case, the State failed to do so.

## III. CONCLUSION

Although the State could have charged and convicted appellant for making a threat on account of his mother's status as a prospective witness, the State did not plead the required statutory element to support a conviction under that theory. *See id.* at 774–76. There is legally insufficient evidence to prove that appellant retaliated against his mother on account of, or because of, her service or status as a witness, as pleaded in the indictment. *See id.* at 774. Accordingly, we must reverse the judgment of conviction and render a judgment of acquittal. *See id.* at 776.

/s/ Ken Wise
Justice

16

Panel consists of Chief Justice Christopher and Justices Wise and Hassan. (Christopher, C.J., dissenting).

Publish — Tex. R. App. P. 47.2(b)